MILTON STROM, Plaintiff, *v.* THEODORE PRINCE and Others,
Defendants.

Municipal Court of New York, Borough of Manhattan, Ninth District,
March 29, 1935.

*Joseph Spence,* for the plaintiff.

*Powers, Kaplan & Berger,* for the defendants.

LEWIS (DAVID C.), J.    The plaintiff moves to amend his summons
and complaint by reducing the amount demanded to $234, with
interest and costs.    This part of the motion is granted.

The plaintiff also moves for judgment on the pleadings under rule
112 of the Rules of Civil Practice, and for summary judgment under
rules 113 and 114, and pursuant to section 476 of the Civil Practice
Act.

The defendant counters with a cross-motion for summary judg-
ment under rule 113.

The action is brought by the plaintiff to recover for work, labor
and services at the agreed price and of the reasonable value of forty
dollars per week, less certain deductions.

The defendants were stockbrokers. The plaintiff was one of their employees — designated as "assistant cashier." When the depression laid its paralyzing hand upon business life, retrenchment and economy became imperative. Some employees lost their jobs; all employees took cuts in their pay. And we also had the payless furlough — where the employee went without his pay and also without the furlough. And it came about that these defendants put before their employees the following proposal:

"*March 28th*, 1932

"In the face of one of·the greatest depressions we have seen, we have maintained our standard of service and fair and suitable rate of remuneration for the past several years.

"We feel that the time has now come when we must ask you to share our responsibilities in this crisis, in line with the talk Mr. Theodore Prince had with you the other day. It is the uncertainty of the future that troubles us rather than the difficulties of the present. We feel that we want to maintain ourselves strongly and permanently, and in order to do that we must prepare for any contingency that might take place within the coming year.

"To date we have eliminated everyone whom we thought did not add to the production, efficiency and standing of our present organization. We have come to the point now where all of us who are here should remain together and see this thing through. After careful consideration, all the partners have felt that the wise thing to do is to institute a stagger system that would go·through the entire office, including the partners. We intended at first that this should be one week in four, and let each man take his vacation. We have, however, come to the conclusion that it would be wiser to make it one week in six and let all of us remain on the job, taking advantage of the present depression to retrench ourselves in our field and improve our efficiency, standing and production.

"Beginning March 28th, therefore, and extending six weeks thereafter, each person will give up the remuneration of one week out of six weeks. We have designated the week of April 22nd from which payment will be withheld. Should this week happen to work some unusual hardship with you, naturally we would not be unsympathetic to a rearrangement of the situation that would be fair to·you and at the same time do justice to all.

"This is an emergency provision and is limited strictly to the existence of the present situation in our own business and not to the depression in the stock market. We feel that should the bond market come back in any normal volume, we will consider that this crisis with respect to us has passed.

" We are making this statement at length so that you can understand in detail all the factors leading up to this decision and also be in a position to judge with us over what length and to what extent this emergency provision should stand. It is needless to say that any sacrifices that have been made by you will be considered by us as a moral debt which will become effective as back payment to you at as early a date as circumstances will permit.

"Accept again our appreciation for your very loyal and conscientious effort and support, which we feel circumstances in the future will amply justify.
                " Very truly yours,
         " (signed)     THEODORE PRINCE.
" TP:EJ "

Thereafter and for an interrupted (not continuous) period, the plaintiff continued in his employment with this payless week arrangement. On September 3, 1934, his services were ended. Now he seeks to recover for the unpaid so-called " sixth weeks."

The plaintiff claims that he is an employee within sections 196 and 197 of the Labor Law, and that any agreement permitting his employers to retain his wages, whether merely as a matter of deferred payment or as a matter of absolute assignment, is illegal.

The defendants contend that the plaintiff does not come within the purview of the Labor Law, and that the arrangement cannot be construed as a retention of pay, but to the contrary, that in truth as well as in theory, it was a reduction of pay.

The court is convinced that we are dealing with a practice adopted to meet the economic crisis, and not with a plan conceived to sidestep the statute.

This brings us face to face with a never-ending problem — the construction and application of a statute. That there is no absolute security in words is an old story. We must be guided more by the purpose than by the phraseology of this statute. If one looks for certainty and conclusiveness to any precise precedent, he may search in vain. The Court of Appeals has shifted its position on this problem and has drawn its own distinctions. (Compare *Palmer* v. *Van Santvoord*, 153 N. Y. 612, at p. 619, with *Matter of Stryker*, 158 id. 526.) And the judges of other courts and authorities are far from complete accord. (*People* v. *Interborough R. T. Co.*, 169 App. Div. 32; *Seidenberg* v. *Duboff & Davies, Inc.*, 143 Misc. 167; *Lajuett* v. *Coty Machine Co., Inc.*, 153 id. 410; *Vianderman* v. *Peyet Silk D. Corp.*, 278 Fed. 993; Opinions of Attorney-General, 1912, 538; Opinions of Attorney-General, 1913, 165, 585.)

The Court of Appeals does remind us that the aim of the statute is social service and social justice. Speaking of another analogous

section of the same law, phrased in the identical language, it states: " The present statute is an attempt by the State to hold its territorial subdivisions to a standard of social justice in their dealings with laborers, workmen and mechanics. It is to be interpreted with the degree of liberality essential to the attainment of the end in view." (*Austin* v. *City of New York*, 258 N. Y. 113, at p. 117.)

This objective demands a liberal, not a literal interpretation. And the statute was enacted as a permanent means, not as an emergency expedient.

We all share the common desire to abate the quibble about the difference in meaning between " salary " and " wages," " employee " and " workingman." Fine words are in law like fine feathers in life. They do not make an executive out of a clerk. A stenographer may be called a secretary; the bookkeeper may be designated an auditor; the cashier may sit in a cage at a coffee pot, or in a cage at the bank. Such is the sophistry of titles. Do the large earnings of the lucky waiter cease to be " wages? " Do the well-paid workers in an organized trade cease to be workingmen or mechanics? Yet one fears that these elements may have been unduly stressed in the distinction that the courts may have written into the statute.

How can this statute serve its real purpose if we put it in the straight-jacket of a too strict or restricted construction? Today clerical work can claim no majesty; and manual labor suffers no menialism.

The difficulty in the matter before me arises out of the questions of fact necessarily presented. For the court must not rest its conclusions upon presumptions, but upon proof. The history of the plaintiff's position is not completely or clearly recorded; the nature of his duties, his powers and his labors, are not plainly and positively recited. The interpretation of the agreement entered into between the parties, their mutual intention and understanding, is not free from dispute. Here there are too many elements of uncertainty as to the facts to warrant the granting of a summary judgment in favor of either side. For these reasons the motions for judgment must be denied and the other applications are disposed of as indicated.